UNITED STATES DISTRICT COURT
<u>SOUTHERN DISTRICT OF NEW YORK</u>
_____X

UNITED STATES OF AMERICA

    vs.

                                                   No. 18 Cr. 874 (JSR)

LUIDJI BENJAMIN,
        a/k/a/ "Zoe," and
LAWRENCE WALSH,
        a/k/a/ "Life,"

        Defendants.
_____X


# SENTENCING MEMORANDUM OF LUIDJI BENJAMIN


MILBANK LLP

Antonia M. Apps
Adam Fee
55 Hudson Yards
New York, NY  10001
Phone: (212) 530-5000

*Counsel for Defendant Luidji Benjamin*

**TABLE OF CONTENTS**

                                                                                                                                                                       **Pages**

I.    PRELIMINARY STATEMENT ...................................................................................... 1

II.   LUIDJI BENJAMIN'S BACKGROUND AND CHARACTER ....................................... 1

III.  THE OFFENSE CONDUCT ........................................................................................... 4

        A.       Procedural History ................................................................................................ 4

        B.       The Properly Calculated Advisory Guidelines Range is 235-293 Months............. 4

IV.  THE SECTION 3553(A) FACTORS WARRANT A SENTENCE NO GREATER THAN THE STATUTORY MINIMUM OF 120 MONTHS' IMPRISONMENT ............ 7

V.    CONCLUSION ............................................................................................................... 11

### I. PRELIMINARY STATEMENT

Mr. Benjamin respectfully submits that the mandatory minimum sentence of 120 months' imprisonment is sufficient but not greater than necessary to satisfy the goals of sentencing pursuant to 18 U.S.C. § 3553(a) in this case. As set forth more fully below, while the offenses of conviction are incredibly serious, Benjamin's age, background, and the nature of the offense weigh in favor of imposing a sentence that does not exceed the substantial term of imprisonment required by statute.

### II. LUIDJI BENJAMIN'S BACKGROUND AND CHARACTER

Mr. Benjamin's young life has been marked by its lack of consistency and the near total-absence of his parents. As the Presentence Report ("PSR") notes, Mr. Benjamin's parents separated when he was two years old, and when he was six, Mr. Benjamin moved to the United States with his father, leaving his mother behind in Haiti. However, since his arrival in the U.S., Mr. Benjamin has had no meaningful parental presence in his life, as his father took little interest in raising Mr. Benjamin. Instead, for most of his youth, Mr. Benjamin was shuffled between homes and apartments belonging to various aunts and other relatives in Queens and Long Island.

By far the most important adult in Mr. Benjamin's life has been his paternal aunt, Marie Benjamin, or as she is known in the family, "Michele." Since he moved into her apartment in Queens in April 2015, she has acted as his primary caregiver for much of his later teenage years, and has provided for him to the best of her ability through income earned as a home health aide.

While Mr. Benjamin only came to live with her when he was 19 years old, Michele did her best to make up for the lack of parental support and the unsettled nature of Mr. Benjamin's younger years. She introduced him to other members of his extended family and her network of friends, many of whom have submitted letters to the Court in connection with sentencing expressing their

affection for Mr. Benjamin.[1]

As discussed in her letter, Michele suffers from serious health issues, which make her especially susceptible to blood clots. Mr. Benjamin has been the bedrock of support for Michele during some of her most trying medical ordeals. For example, in July 2015, when she was hospitalized for about one month, Mr. Benjamin did not leave her side. *See* Ex. A at 1. At this point, Michele's greatest concern is simply surviving long enough to see Mr. Benjamin upon his release from prison.

In their letters to the Court, other members of Mr. Benjamin's family have also described Mr. Benjamin's caring and generous nature towards his family. His sister, Yolette Benjamin, writes that she and Mr. Benjamin "talk about everything" and that "he was always there for her no matter what." *See* Ex. A at 3. Mr. Benjamin's grandmother, Yolette Osirus, who also had a hand in raising him, said that he has always been there for her, including accompanying her to medical appointments. *See* Ex. A at 4.

Mr. Benjamin's cousin, John Louis, has also spoken to the kind nature of Mr. Benjamin. John and Mr. Benjamin have known each other since they were young children. John said he looked up to Mr. Benjamin and sought him out for advice and support. *See* Ex. A at 5.

These descriptions of Mr. Benjamin's caring and kind nature are echoed in the letters submitted by close family friends, who knew Mr. Benjamin as a young adolescent who was thoughtful and respectful of others. *See* Ex. A at 6-8.

Unfortunately, despite the best efforts of his aunt Michele and others who cared about him, Mr. Benjamin made bad choices as a teenager, hanging with the wrong crowd and developing a very heavy marijuana habit. He began smoking marijuana at approximately age 13, and developed

---

[1] Exhibit A ("Ex. A") contains seven letters of support from family and friends of Mr. Benjamin.

a nearly half-pound daily habit by the time he was 16. This early and overwhelming use of narcotics degraded Mr. Benjamin's focus and decision-making — he struggled to stay in school, to find and keep a job, and to forge healthy emotional connections with friends, family, and significant others.

By early 2015 – when Mr. Benjamin turned 19 – his poor choices, and lack of sufficient support, led to a series of deeply misguided decisions. He committed and was arrested for a burglary offense in Queens. The arrest led to him dropping out of high school during his senior year; he has yet to return or attain his GED. And while Mr. Benjamin eventually was compelled to seek treatment for his marijuana habit – both as the result of his burglary arrest, and through the efforts of his aunt – he was never able to stop using the drug, and continued to sell to others and associate with others involved in drugs and petty criminal offenses.

Thus, Mr. Benjamin found himself a 19-year old high school dropout, living in Michele's basement with no legitimate employment, and almost no contact with either of his still-living parents. While Mr. Benjamin maintained a relationship with his aunts and sister, he lacked any male role model or authority figure in his life, and foolishly came to believe that it was a mark of manhood to pursue romantic relationships with multiple young women. This led him on a path of promiscuity and casual romantic relationships. It also – to his everlasting regret – put Mr. Benjamin in the mindset where he elected to have a romantic relationship with a young teenager – for which he pled guilty to a count of child endangerment in New York State court – and to his relationship with Victim-1.

Mr. Benjamin cannot go back and fix his horrible decisions to have relationships with minors. And he will be punished severely for the events leading to his conviction in this case. But the context is important when weighing just how severely he should be punished: these judgments

were made by a foolish teenager. As reflected in the letters submitted to the Court, his family members express deep regret for not doing more to help Mr. Benjamin during this period, and for not protecting him from his own poor choices. But the fact that this network of family and friends still professes affection for Mr. Benjamin shows that Mr. Benjamin may very well have the support network necessary for him to become a productive, law-abiding member of society once he completes his sentence.

While his turbulent life and poor decisions have led Mr. Benjamin to his present circumstance, the years prior to his incarceration did yield one significant silver lining – they gave him his now two-year old daughter. Mr. Benjamin deeply loves his daughter, has maintained a strong relationship with her, and has had her visit him in jail. Mr. Benjamin would like to remain a part of his child's life in any way he can, something that would be made more difficult with a sentence in excess of the statutory minimum.

### III.   THE OFFENSE CONDUCT

#### A.   Procedural History

On December 11, 2018, the government charged Mr. Benjamin with conspiracy to commit sex trafficking (Count One) and one substantive count of sex trafficking of a minor (Count Two). On May 15, 2019, following a six-day trial, Mr. Benjamin was convicted of both counts.

The PSR calculates Mr. Benjamin's offense level as 38, which, when combined with his criminal history category of III, gives him a guideline sentencing range of 292 to 365 months' imprisonment.

#### B.   The Properly Calculated Advisory Guidelines Range is 235-293 Months

The PSR includes two enhancements that are not persuasively supported by the record. In paragraphs 28 and 36 of the PSR, the Probation Office concluded that, pursuant to Sections

4

2G1.3(b)(3)(A) (with respect to Victim-1) and 2G1.3(b)(3)(B) (with respect to Victim-2), a 2-level enhancement for each victim is warranted.

Section 2G1.3(b)(3)(A) provides for a two-level increase where an offense involved the use of a computer to "persuade, induce, entice, coerce, or facilitate the travel of, the minor to engage in prohibited sexual conduct." However, the record does not support such an enhancement in this case. As an initial matter, the record is split on whether Victim-1 first met Mr. Benjamin online through Facebook or in person while hanging out in Queens. While the PSR correctly notes that Victim-1 testified that she first met Mr. Benjamin through Facebook, it omits that the government's case agent testified that Victim-1 told the agent that she first met Mr. Benjamin while hanging out in Queens, and not through Facebook. *See* Trial Tr. 435:10-436:3.

Nor was there any evidence presented to show that, at the time Mr. Benjamin was communicating with Victim-1 on Facebook, he intended to have her engage in prostitution, or that he was even aware that she was a minor. According to Victim-1's testimony, during her initial communications on Facebook with Mr. Benjamin, Mr. Benjamin did not discuss her involvement in prostitution. *See* Trial Tr. 135:8-16. Victim-1 further testified that her Facebook page at the time she met Mr. Benjamin indicated she was 21 years old, and that she did not tell Mr. Benjamin that she was 16 until after her first face-to-face meeting with Walsh and Mr. Benjamin in Queens. *See* Trial Tr. 65:19-25; 80:10-19. Indeed, the government did not even seek to introduce the Facebook communications between Victim-1 and Mr. Benjamin that underlie this enhancement; nor did the government offer any witness or document relating to any alleged plan on Mr. Benjamin's part to have Victim-1 or other minor girls engage in prostitution in or around the time he first began communicating with Victim-1 on Facebook.

5

This case is distinguishable from *United States v. Cramer*, in which the Second Circuit held that the 2-point enhancement under Guidelines section 2G1.3(b)(3)(A) is warranted when a defendant uses the Internet to establish a relationship with a minor victim. 777 F.3d 597, 600 (2nd Cir. 2015). In *Cramer*, the Second Circuit found that even though the defendant did not actually solicit one of his victim's participation in sex trafficking online, such solicitation "would not have been possible without the initial contact by computer." *Id.* at 602. Here, the record is insufficient to support a finding that Mr. Benjamin and Victim-1's initial contact occurred on the internet or that, if it did, Mr. Benjamin was seeking out such contact for the purpose of furthering some criminal activity.

With respect to Victim-2, Section 2G1.3(b)(3)(B) provides for a two-level increase if the offense involved the use of a computer or an interactive computer service to "entice, encourage, offer, or solicit a person to engage in prohibited sexual conduct with the minor." There was no evidence at trial showing that Mr. Benjamin ever used a computer or interactive computer service to post advertisements relating to Victim-2 or to solicit individuals to engage in prohibited sexual conduct with Victim-2.

To the contrary, Victim-2's testimony places responsibility for any sexual conduct in which Victim-2 engaged on the shoulders of Victim-1 and Walsh. Victim-2 testified that it was Walsh and Victim-1, not Mr. Benjamin, who first suggested that she engage in prostitution. *See* Trial Tr. at 381:3-7 and 389:5-15. She further testified that it was Walsh and Victim-1 who took photographs of her for use in online advertisements, that they used Walsh's phone to post the advertisements, and that all of this conduct occurred at Walsh's home. *See* Trial Tr. 383:2-22 and 389:22-390:4. Indeed, Walsh testified that he had never even seen Victim-2 and Mr. Benjamin have a single conversation. *See* Trial Tr. 250:19-251:3.

In response, the government may point to testimony indicating that Mr. Benjamin might have been present at Walsh's home when the group discussed the possible prostitution of Victim-2.  *See* Trial Tr. 380:2-381:18.  But that evidence – standing alone – should not be sufficient to support application of the enhancement here, where the overwhelming weight of the evidence shows that Mr. Benjamin did not take any steps to further the victimization of Victim-2.

Accordingly, absent these two enhancements, the properly calculated Guidelines Range is 235-293 months.

## IV. THE SECTION 3553(A) FACTORS WARRANT A SENTENCE NO GREATER THAN THE STATUTORY MINIMUM OF 120 MONTHS' IMPRISONMENT

The PSR recommends a sentence at the bottom end of the Guidelines range.  Mr. Benjamin believes there are additional mitigating factors under Section 3553(a) that make a sentence of 120 months' imprisonment sufficient but not greater than necessary to achieve the statutory goals of sentencing.

First, the history and characteristics of Mr. Benjamin do not suggest – in contrast with the overwhelming majority of defendants convicted for similar offenses in this District – that he is a prolific pimp.  What the PSR and the record show instead is that Mr. Benjamin was nearly a child himself when he was overwhelmed by drug abuse, the impact of both of his parents being effectively absent since he was six years old, and his own bad choices, and opportunistically participated in the sex trafficking of Victim-1 in concert with an older and more experienced child sex trafficker — the government's witness, Lawrence Walsh.

Second, the offense in this case is relatively less severe than nearly all of the other cases involving similar offenses in this District.  There is no evidence establishing that Mr. Benjamin targeted Victim-1 due to her residence in a state facility, or that he was even aware of that fact.  There is no evidence indicating that Mr. Benjamin ever used force on Victim-1 outside of the one

7

instance of self-defense recorded by the Nassau County Police Department.[2]

Nor is there any evidence indicating that Mr. Benjamin engaged in an extended course of sex trafficking conduct, or, for that matter, engaged in any sex trafficking or prostitution of minors outside of the conduct that was described at trial. Indeed, the only other prostitution activity involving Mr. Benjamin were his attempts to prostitute himself via online ads.

This stands in stark contrast to the heartland of defendants convicted for similar crimes, including Mr. Benjamin's co-defendant, Lawrence Walsh. At trial, Walsh – like most sex traffickers convicted under the same statutes and subject to the Guidelines sections at issue here – admitted that he engaged in an extended course of child sex trafficking, which included at least four minor girls, including the two victims in this case. *See* Trial Tr. 259:4-18; 265:7-10; 322:13-25; 349:20–350:21.

Also in contrast with Walsh and other defendants convicted of similar offenses, there was not a significant age gap between Mr. Benjamin and Victim-1. While it does not, of course, constitute a legal defense to the offenses of conviction or lessen the harm done to Victim-1, we submit that the 3-year age difference between Mr. Benjamin and Victim-1 should be taken as a relative mitigating factor in contrast to cases involving defendants preying on far younger individuals.

Taken together, the evidence showing the relatively less severe nature of Mr. Benjamin's conduct reflects that Mr. Benjamin was a misguided teenager suffering from addiction while making a series of bad decisions, and not that he was an inveterate predator engaging in an extended course of conduct designed to victimize young children. These distinguishing factors

---

[2] The PSR incorrectly notes that a protective order was issued against Mr. Benjamin with respect to Victim-1. PSR at ¶ 49. As the trial record reflects, Mr. Benjamin was the protected party under that order, and not Victim-1. See Trial Tr. 146:8-22.

call for a sentence far below the Guidelines range in order to avoid an unwarranted sentencing disparity and to provide for just punishment.

Looking at even a small sample of similar cases in this District establishes that courts overwhelmingly favor imposing sentences below the Guidelines range, even where the conduct is far more serious than what is found here:

- *United States v. Hope*, 15 Cr. 888 (SHS): With a Guidelines range of 360 months to life imprisonment, the court imposed a sentence of 216 months after the defendant pled guilty to one count of conspiracy, one count of sex trafficking of a minor, one count of possession of child pornography, and one count of a felon in possession of a firearm. According to the defense sentencing submission, the defendant, who was 28 years old at the time of the offense, had been operating a prostitution business for at least two years, and often threatened his victims with a firearm.

- *United States v. Almonte*, 16 Cr. 670 (KMW): With a Guidelines range of life imprisonment, the court imposed a sentence of 240 months on the defendant in connection with her operation over the course of approximately two years of a large-scale prostitution business, which involved the trafficking of at least six minor girls, including the defendant's three younger sisters.

- *United States v. Corley*, 13 Cr. 48 (AJN): With a Guidelines range of 210-262 months, the court imposed a sentence of 120 months based on the 29-year-old defendant prostituting three 16-year-old runaways for a period of approximately six months.

In these cases, the defendants prostituted multiple women and young girls, for extended periods of time, yet received sentences often far below the low end of the advisory Guidelines range. By contrast, in this case, the record shows that Mr. Benjamin participated in the trafficking of a single minor victim who was only three years his junior, for a period of only approximately one to two months, and did so under the influence of an older, more experienced sex trafficker. It would betray any reasonable notion of just punishment to impose a sentence on Mr. Benjamin that was equal to or more severe than the sentences meted out to other similarly situated defendants who engaged in far more serious conduct.

Finally, the need to afford adequate deterrence weighs in favor of a sentence far below the advisory Guidelines range. While Mr. Benjamin's short life has been marked by bad choices and

9

the very serious criminal conduct at issue in this case, it does not reflect that he is so immune to rehabilitation that he requires a sentence in excess of the statutory minimum applicable here. To the contrary, despite the hardships he faced, including those that were self-imposed, Mr. Benjamin has shown others that he can, under the right circumstances, be a kind, caring, and thoughtful individual.

Mr. Benjamin committed these crimes when he was only 19, and has shown the ability to be something more than what is seen in this trial record. A 10-year prison term would allow Mr. Benjamin to build on the good that at least some have seen in him, and to be a meaningful presence in his daughter's life; a 20-year prison term makes it far less likely that he will have the time and capacity to return to society and make a meaningful contribution to it and to his daughter.

## V. CONCLUSION

We respectfully submit that the statutory goals of sentencing will be satisfied, and a just sentence imposed, by the statutory minimum sentence of 120 months' imprisonment. Such a sentence recognizes the incredibly serious nature of the offenses of conviction, and the harm done to the victims, while also taking into account the mitigating characteristics unique to Mr. Benjamin and avoiding unwarranted sentencing disparities with other similarly situated defendants.

Dated: September 6, 2019
      New York, New York

                                      Respectfully submitted,

                                      /s/ Antonia M. Apps
                                      Antonia M. Apps
                                      Adam Fee
                                      MILBANK LLP
                                      55 Hudson Yards
                                      New York, NY 10001
                                      Telephone: 212-530-5000

                                      *Counsel for Defendant Luidji Benjamin*