

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

September 11, 2019

**BY ECF**

The Honorable Jed S. Rakoff
Southern District of New York
500 Pearl Street Square
New York, New York 10007

      Re:    *United States v. Luidji Benjamin*, 18 Cr. 874 (JSR)

Dear Judge Rakoff:

      The Government submits this letter in connection with the sentencing of Luidji Benjamin (the "defendant") in the above-referenced matter, currently scheduled for September 13, 2019 at 3:30 p.m. The defendant was convicted after trial of sex trafficking of a minor and conspiracy to commit sex trafficking of minor victims, in violation of Title 18, United States Code, Sections 1591(b)(2) and 1594(c). In the Final Presentence Report, dated August 30, 2019 ("PSR"), the Probation Office calculated an offense level of 38, a criminal history category of III, and a resulting Guidelines range of 292 to 365 months' imprisonment (the "Guidelines Range"). For the reasons set forth below, the Government respectfully submits that a sentence within the Guidelines Range is necessary to satisfy the goals of sentencing.

**A. Trial and Offense Conduct**

      On December 11, 2018, a Grand Jury sitting in the Southern District of New York returned an indictment, 18 Cr. 874 (the "Indictment"), charging the defendant and the co-defendant Lawrence Walsh in two counts. Specifically, the defendant was charged with in Count One with conspiring to traffic minor girls for sex, including at least one minor victim who was a resident of a residential treatment facility for troubled youth ("Facility-1") in or about the Fall of 2015, in violation of 18 U.S.C. § 1594(c); and in Count Two with sex trafficking of a minor, also in or about the Fall of 2015, in violation of 18 U.S.C. §§ 1591(a) and (b)(2).

      The Indictment was unsealed on December 12, 2018. Pursuant to a *writ of habeas corpus ad prosequendum*, the defendant was transferred from New York state custody to federal custody on January 7, 2019. On that date, the defendant appeared before the Honorable Katharine H. Parker, United States Magistrate Judge for the Southern District of New York, and consented to detention without prejudice. On January 11, 2019, the defendant appeared before this Court and was arraigned on the Indictment.

      The jury trial began on May 8, 2019. On May 15, 2019, the jury returned a guilty verdict as to both counts charged in the Indictment.

As the evidence at trial showed, in or about the Fall of 2015, the defendant met a particular 16 year-old female ("Victim-1") on the website Facebook.com. (PSR ¶ 11). At the time Victim-1 was living at Facility-1. Through their Facebook communications, the defendant conveyed a romantic interest in Victim-1 and, eventually, asked Victim-1 to meet in person. Subsequently, Victim-1 traveled by train from Westchester County to Queens, New York to meet the defendant. Shortly after arriving in Queens, the defendant conveyed to Victim-1 that Victim-1 could make money by engaging in prostitution.

Victim-1 lived with the defendant in Queens for multiple weeks, during which time Victim-1 engaged in prostitution on the defendant's behalf, and gave almost all the proceeds to the defendant. (PSR ¶ 12). The defendant and Victim-1 posted advertisements for commercial sex on certain websites, including Backpage.com and Craigslist.org. The advertisements included certain photographs that the defendant took of Victim-1, including pictures of Victim-1 partially nude and at least one picture showing Victim-1 performing oral sex on a man whom Victim-1 testified at trial was the defendant. (PSR ¶ 12; *see also* Trial Transcript ("Tr.") at 96:14-19). The advertisements listed Victim-1's prices for commercial sex services: $75 for a "short stay," referring to a period of about 10 or 15 minutes; $100 for a half-hour; $120 for an hour; and $80 for oral sex. The advertisements also referenced Victim-1's particular physical build, repeatedly describing her as a "BBW" for "big beautiful woman." (Tr. 97:11-13). The defendant also focused his advertisements on particular sex acts that Victim-1 performed, describing Victim-1 as, among other things, an "Ebony Bbw head Monsta" as a reference to oral sex. (Tr. at 97:9-98:1). The defendant had Victim-1 engage in prostitution at various locations in Queens, primarily at the residences of the defendant's friends, including Walsh. (PSR ¶ 13). The defendant made Victim-1 engage in commercial sex acts with his friends when those friends had money. (Tr. at 116:17-117:5). The defendant took the money that Victim-1 earned from prostitution and used it on himself, for things like "weed, liquor, and his friends." (Tr. at 89:12).

Victim-1 believed that she and the defendant were in a romantic relationship during the time that she engaged in commercial sex acts for him, that she "believed he was supposed to be [her] boyfriend." (Tr. at 116:13). Eventually, Victim-1 stopped working for the defendant after a fight. Victim-1 recounted at trial that she sent the defendant a picture of a "baby emoji" and that the defendant "went off that if [Victim-1] was pregnant it wouldn't be his baby. He said he was to kick [Victim-1] out of his house." (Tr. 117:13-16). This argument let to a physical altercation during which Victim-1 hit the defendant with a bottle, the defendant struck Victim-1 with a frying pan, and Victim-1 then stabbed the defendant. (Tr. at 117:17-22).

Also in or about the Fall of 2015, the defendant conspired with his co-defendant, Walsh, to traffic a second particular minor female ("Victim-2"), who was then 15 years old, for commercial sex services. (PSR ¶ 14). Victim-2 testified that, in a group discussion with the defendant ("Zoe"), Walsh ("Life"), and Victim-1, they told her about "a way for [her] to make money," referring to prostitution. Victim-1, who was then working for the defendant, instructed Victim-2 about "what to do, what to say to customers, the prices." (Tr. at 382:15-16). The defendant assisted with Victim-2's online advertisements, "help[ing] to make up captions to pull customers." (Tr. 383:11). The defendant had sexual intercourse with Victim-2 on at least one occasion, (*see* Tr. at 378:6-10), and attempted to recruit Victim-2 to engage in prostitution on his behalf, (*see* Tr. at 385:23-386:9).

### B. The Defendant's Submission and Probation Office's Recommendation

The defendant's submission, dated September 6, 2019, argues that the defendant should be sentenced to the mandatory minimum sentence of 120 months. The defendant argues that a below-Guidelines sentence is warranted because of, among other things, the defendant's background, age, and nature of the offense, describing "poor choices" made by a "foolish teenager." (Def. Mem. at 4). The defense submission includes seven letters of support from family and friends of the defendant.

The Probation Office recommends a sentence of 292 months' incarceration, based on, among other factors, the nature of the offense, the defendant's lack of remorse, and his criminal history, which includes a conviction for endangering the welfare of a child. (PSR at p. 23).

### C. Discussion

The Government respectfully submits that the seriousness of the offense, the need to promote respect for the law, ensure just punishment, protect the public, and afford adequate deterrence, all warrant imposition of a sentence within the Guidelines Range. While the defendant's age is a mitigating factor, his conduct caused substantial harm to even younger victims. The defendant's "poor decisions" were in fact calculated choices to exploit those more vulnerable and more desperate than him. (Def. Mem. at 4). A substantial incarceratory prison sentence is necessary and appropriate here.

*1. Guidelines Calculation*

The defense disputes the applicability of two-point enhancements for use of a computer during the offense with respect to Victim-1 and Victim-2. U.S.S.G. § 2G1.3(b)(3). Section 2G1.3(b)(3) of the Sentencing Guidelines provides for a two-level increase to the offense level "[i]f the offense involved the use of a computer or an interactive computer service to (A) persuade, induce, entice, coerce, or facilitate the travel of, the minor to engage in prohibited sexual conduct; or (B) entice, encourage, offer, or solicit a person to engage in prohibited sexual conduct with the minor."

The defendant disputes the applicability of this two-level enhancement with respect to Victim-1, arguing that the evidence is insufficient to show that the defendant and Victim-1 first met on the internet. However, as Victim-1 credibly testified at trial, the defendant used Facebook—an interactive computer service—to recruit Victim-1 from Westchester, New York, who days after arriving in Queens, New York to meet the defendant in person began to engage in prostitution on his behalf. (*See* Tr. at 82:8-10). U.S.S.G. § 2G1.3(b)(3)(A). In the defendant's presentence interview, he seemed to acknowledge that his early interactions with Victim-1 occurred through Facebook, even while maintaining that their introduction occurred in Queens, New York. The defendant stated, with respect to Victim-1, that: "We met on Jamaica Avenue. We exchanged Facebook account information and started talking through Facebook." (PSR ¶ 21). In other words, and by his own admission, the defendant used Facebook to develop a relationship with Victim-1. He then used that relationship to recruit her to Queens and into prostitution.

Victim-1's testimony was credible as to their initial introduction via Facebook, but that point of testimony is not dispositive as to the applicability of the enhancement. Regardless of where they first met, the defendant used Facebook to persuade, induce, or entice Victim-1 to come to Queens where he then—in a matter of days—encouraged her to engage in prostitution.

Furthermore, in the alternative, the evidence at trial otherwise overwhelmingly established that the defendant posted advertisements to Backpage.com—an interactive computer service—to advertise Victim-1 for commercial sex services. U.S.S.G. § 2G1.3(b)(3)(B). Either fact would, by itself, support the application of the two-level increase to the offense level, and both facts were established by the evidence and testimony at trial.

With respect to Victim-2, and as the defendant acknowledges, the evidence at trial established that Victim-2 was posted in online advertisements used to solicit customers to engage in commercial sex acts with Victim-2. The evidence established that the defendant was present, and engaged in, the conspiracy to traffic Victim-2. His relatively culpability to Walsh is irrelevant to the applicability of this enhancement, which was supported by the evidence introduced at trial. (*But see* Def. Mem. at 7 (describing that the defendant "did not take any steps to further the victimization of Victim-2")).

Accordingly, the Government submits that the Probation Office's calculation of the offense level, resulting in an adjusted offense level of 38, is correct.

## 2. *Seriousness of the Offense and Respect for the Law, and Just Punishment*

The gravity of this type of offense is immense. The defendant trafficked Victim-1, a 16-year-old runaway; he also participated in the trafficking of, and attempted to recruit for prostitution, Victim-2, a 15-year-old runaway. The harm to children that results from being sold to adult men for sex is well established. This is no exception, as the defendant's conduct caused substantial harm to Victim-1 and Victim-2. Victim-1 and Victim-2 were only teenagers during the time of the offense conduct, supposed to be attending high school, but instead being photographed in various states of nudity and in suggestive positions, posted online in objectifying advertisements, and then sold to various men to engage in commercial sex acts for cash. Victim-1 and Victim-2 both testified at trial, and their demeanors revealed the harm and trauma that they continue to experience from this criminal conduct.

The defendant's statements in the context of his presentence interview leave little doubt that he still has not accepted responsibility for his conduct, which was proved at trial beyond a reasonable doubt. The defendant claims that he was "set up," continues to blame his co-defendant, Walsh—who already has accepted responsibility by pleading guilty to his involvement in the sex trafficking offense—and, perhaps most incredibly, maintains that Victim-1 worked alone. (PSR ¶ 21). The defendant demonstrates no remorse and no acknowledgment of the harm that he caused.

The defendant's claim that his co-defendant Walsh was an "older, more experienced sex trafficker" is a distortion of the facts and not supported by the evidence at trial. (*But see* Def. Mem. at 7 (describing that the defendant "opportunistically participated in the sex trafficking of Victim-1 in concert with an older and more experienced sex trafficker – the government's witness,

Lawrence Walsh")).  Walsh testified that, in the Fall of 2015, he already was familiar with prostitution because he previously had prostituted himself—because he was "desperate for money"—not because he was running a thriving sex trafficking business.  (Tr. at 233:10-234:7). Moreover, this argument ignores that Walsh neither recruited Victim-1 nor profited from her prostitution.  It was the defendant, not Walsh, who established a relationship with Victim-1 over Facebook, enticed Victim-1 to leave Facility-1 to meet him in Queens, and advertised Victim-1 for commercial sex, exploiting her for his own gain.  The defendant's attempt to blame Walsh for his own activities is unavailing.  There can be no doubt that responsibility for the trafficking of Victim-1 lies squarely on the defendant.

To the extent that Walsh was involved in Victim-1's exploitation, it was to assist and facilitate the defendant's scheme.  The defendant sent Walsh to pick up Victim-1 when she arrived in Queens, and Walsh brought Victim-1 to meet the defendant.  (*See* Tr. at 75:16-77:4; 236:6-238:16).  The defendant later took Victim-1 to his aunt's house, from where the defendant continued to sell her for sex (Tr. at 78:22-80:11) because, as Victim-1 said, the defendant "needed money for like weed, clothes and stuff."  (Tr. at 81:4-6).  Further, as Victim-1 testified, this was not a novel idea for the defendant—he described to Victim-1 how "he used to post pictures and make advertisements."  (Tr. at 82:3-7).  Both Victim-1 and Walsh testified that, for some period of time, the defendant and Victim-1 stayed at Walsh's residence.  As Victim-1 testified, the defendant stated that they were changing locations "to try to make more money doing in-calls." (Tr. at 108:4-8).  In other words, the defendant used Walsh's residence to try to make more money for himself from his trafficking of Victim-1.

The defense's attempts to absolve the defendant of any responsibility for his involvement in the conspiracy of trafficking Victim-2 are equally unavailing.  Certainly, Walsh was the primary beneficiary of Victim-2's prostitution.  That said, as set forth above, the defendant participated in the conversation, along with Walsh and Victim-1, about Victim-2's engaging in prostitution.  The defendant was present and participated in the discussion during which Victim-2 was recruited into prostitution as a way to make money.  The defendant also was present in Walsh's house while Victim-2 was photographed for advertisements, then posted online, and sent to meet customers. These activities occurred within the defendant's view, and while he was using the same location to profit from Victim-1's parallel activities.  Moreover, that the defendant did not independently traffic Victim-2 was not for lack of effort, as he tried to recruit her to engage in commercial sex acts on his behalf.  (*See* Tr. at 385:23-386:9).

The defendant's conduct, especially with respect to Victim-1 and also as to Victim-2, shows his total lack of respect for the law, and a dangerous indifference to the circumstances of particularly vulnerable members of society.  When Victim-1 told the defendant that Victim-1 was 16, the defendant's response was that Victim-1's age "wouldn't matter."  (Tr. at 80:15-25).  Even after learning Victim-1's age, the defendant continued to advertise and facilitate Victim-1's prostitution, and to collect prostitution proceeds from Victim-1 that he used to fund his lifestyle. Similarly, Victim-2 testified that the defendant learned her age when she first was introduced to the defendant by one of his friends, recalling that the friend said something like, "she's young and telling them my age, that I was 15."  (Tr. at 378:11-20).  Nevertheless, following this introduction, the defendant participated in the conversation where prostitution was suggested as a way for a desperate 15-year-old runaway to make money, and he assisted in the trafficking of Victim-2.

Further still, and removing any doubt as to the defendant's intentions, he later tried to recruit Victim-2 for himself, to engage in commercial sex on his behalf.

Fundamentally, the defendant's conduct in recruiting Victim-1 exploited her immaturity and desperation—he recruited her by feigning romantic interest and then used Victim-1's reciprocation of that (false) interest to induce her cooperation in his trafficking scheme. Within days of Victim-1 arriving in Queens, the defendant was selling her for sex. Victim-1 engaged in prostitution for the defendant's financial benefit because she believed that they were in a relationship, even after the defendant forced Victim-1 to engage in commercial sex acts with his own friends for money—extracting her participation under the guise that he was her boyfriend. The defendant may have been relatively young at the time of the offense, but his predatory conduct reveals a very developed ability to identify and exploit vulnerable victims even younger than him. This kind of sustained exploitation, over at least a period of weeks, cannot be reduced to the foolish and immature judgment of a teenager.

The defendant was not oblivious to Victim-1's and Victim-2's circumstances; to the contrary, as the evidence at trial showed, he instead exploited the vulnerability resulting from those circumstances. The severity of this conduct shows a total lack of respect for—even contempt of—the law, and warrants substantial punishment.

### 3. *The Need to Protect the Public and Deter the Defendant and Other Similarly Situated Individuals*

The defendant's criminal record shows that these offenses were not his first experience with law enforcement. On May 27, 2015, months before the defendant engaged in the offense conduct, the defendant was arrested for attempted burglary in the third degree. According to the PSR's description of the underlying offense, the defendant entered a residence in Jamaica, New York, and took several items, including a Sony PlayStation gaming console, $500 in U.S. currency, flip flops, and a Gucci wallet. (PSR ¶ 52). The defendant pled guilty and was adjudicated a youthful offender on December 3, 2015. (PSR ¶ 52). Only days after this plea, as early as December 10, 2015, the defendant was posting Victim-1 in advertisements on Backpage. (Tr. at 95:14-22 (describing GX 810)). The defendant apparently was undeterred by his interaction with the criminal justice system, and embarked upon the even more serious offense of sex trafficking.

The defendant's conduct with respect to Victim-1 and Victim-2 was not an aberration, but rather, consistent with a pattern of exploitation of vulnerable minor victims. In April 2017, the defendant again committed heinous criminal conduct involving a minor victim ("Victim-3"), the mother of the defendant's child. As set forth in the PSR, the underlying NYPD reports reflect that Victim-3 stated to law enforcement that she had a verbal dispute with the defendant—her "boyfriend"—which resulted in him punching her in the stomach, when at the time she was approximately three months pregnant. (*See* PSR ¶ 54). Victim-3 was then 14 years old and reported to the NYPD that she had been dating the defendant, then 20 years old, for approximately five months and was three months' pregnant with the defendant's child. Ultimately, the defendant pled guilty to endangering the welfare of a child.

The defendant's egregious conduct with Victim-3 echoes the conduct that emerged from testimony at trial. Victim-1 testified at trial that she and the defendant got into a physical altercation because Victim-1 sent the defendant a "baby emoji" and she surmised that "he thought I was pregnant …." (Tr. at 117:11-22). Victim-1 and the defendant then had a violent altercation, during which he hit her multiple times in the head with a frying pan.

The defendant's conduct with respect to Victim-3 and his fight with Victim-1 are two separate instances of the defendant's violence toward minor girls and, more specifically, of using violence against minor girls whom he knew or believed he had impregnated. His conduct cannot be reduced to youthful indiscretions or poor judgment; rather, it demonstrates the defendant's violent and exploitative arrangements with minor girls under the guise of romance. (*See* Def. Mem. at 3 (describing defendant as "foolishly … believ[ing] that it was a mark of manhood to pursue romantic relationships with multiple young women")). The defendant has demonstrated a pattern of preying on minors for sex and to make money for himself. There is a real need to protect the public, and especially its most vulnerable members, from the defendant.

Moreover, a substantial sentence of incarceration would send a powerful message to others who are disposed to commit similar heinous offenses against minors. It would show that such actions will not be taken lightly, and that those who victimize children—especially particularly vulnerable ones, from the foster care system—will be prosecuted and punished to the fullest extent of the law.

### D. Conclusion

For the reasons set forth above, the Government respectfully requests that the Court impose a sentence within the Guidelines Range, as such a sentence would be sufficient but not greater than necessary to serve the legitimate purposes of sentencing.

    Respectfully submitted,

    GEOFFREY S. BERMAN
    United States Attorney

By:    /s/
    Mollie Bracewell
    Jacob Gutwillig
    Assistant United States Attorneys
    (212) 637-2218/2215